# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| OHIO HARNESS HORSEMEN'S ASSOCIATION, INC., | ) ) ) | CASE NO. 5:16-cv-1780 |
| PLAINTIFF, | ) ) ) | JUDGE SARA LIOI |
| vs. | ) ) ) | **MEMORANDUM OPINION AND ORDER** |
| NORTHFIELD PARK ASSOCIATES, LLC, et al., | ) ) ) ) | |
| DEFENDANTS. | ) | |

Before the Court is the emergency motion of Northfield Park Associates, LLC ("NPA") for relief from the extended agreed order of August 8, 2016. (Doc. No. 142 ["Mot."].)[1] Plaintiff Ohio Harness Horsemen's Association, Inc. ("OHHA") filed its opposition (Doc. No. 145 ["Opp'n"]), with Exhibits B, C, and H filed under seal (Doc. Nos. 146, 147, and 148, respectively). NPA filed its reply. (Doc. No. 149 ["Reply"].) Upon the parties' joint request, the Court permitted supplemental briefs. (Doc. No. 227 ["Pl. Suppl. 1"]; Doc. No. 228 ["Def. Suppl. 1"].) On December 5 and 6, 2017, the Court conducted a hearing, accepting testimony and argument. (*See* Doc. Nos. 235 & 236 (Transcript ["Tr.1" and "Tr.2"].) Additional supplemental briefs were permitted post-hearing. (Doc. No. 237 ["Pl. Suppl. 2"]; Doc. No. 238 ["Def. Suppl. 2"].) For the reasons and in the manner discussed herein, the emergency motion is granted.

---

[1] The complete motion, with all exhibits, was filed under seal. (Doc. No. 143.)

# I. GENERAL BACKGROUND[2]

The parties to this lawsuit have had a very successful business relationship for decades. NPA operates Northfield Park Racetrack in Northfield, Ohio, as well as an adjacent "racino" with video lottery terminals ("VLTs"). OHHA represents the majority of owners, trainers, drivers, and grooms of Standardbred horses in Ohio, many of whom stable their horses and reside at the racetrack's backstretch, and many of whom also participate in harness horse racing events at the racetrack. Pursuant to the terms of an agreement between the parties, and under requirements of federal and state law, NPA deposits certain monies, including a percentage of its lottery agent commission for the VLTs, into a dedicated purse account, administered by NPA, for the purpose of paying purses for races at the track. In addition to accepting wagers on live harness racing, NPA exports the simulcast signal of live racing at NPA to other racetracks and off-track betting locations around the country, soliciting and accepting wagers on the NPA races. Under federal law, such wagering is permitted only with the consent of, among others, the applicable "horsemen's group," in this case, OHHA.

On July 12, 2016, OHHA filed this lawsuit against NPA. OHHA alleged various claims against NPA, all grounded in rights established by federal and state law, as well as by the Agreement between the parties entered into on November 19, 2014 and effective from December 16, 2013 until December 15, 2023. (*See* Interstate Horseracing Act of 1978, 15

---

[2] This background is gleaned largely from the complaint filed on July 12, 2016. (Doc. No. 1.) Although it has since been amended, at the time the currently-challenged agreed order was entered, the original complaint was the context within which the parties were operating and is, therefore, the relevant pleading for purposes of this analysis.

U.S.C. § 3001, *et seq.* ("IHA"); Ohio Rev. Code Chapter 3769; Doc. No. 1-3 ["Agreement"].)

OHHA generally alleged[3] that, because it was demanding that NPA cease misusing and mismanaging the purse account, cease engaging in export simulcast wagering without OHHA's statutorily-required consent, and cease refusing to disclose necessary wagering documents and information, NPA was threatening to shut down its simulcast signal on July 27, 2016 (because it only had consent through July 26, 2016), reducing purses to OHHA for all races starting August 1, 2016, and converting the track to a ship-in only facility (which means that the horsemen and horses could no longer live and work at NPA). OHHA alleged that these actions would be improper under the Agreement, as well as retaliatory, and that significant damage to OHHA and its members would result. The original complaint set forth seven counts, asserting various violations of the IHA (count I [lack of consent], count II [retaliation], and count III [declaration of right to full disclosure]); breaches of fiduciary duty and trust (count IV [retaliation] and count V [waste, disloyalty, and lack of full disclosure]); and breaches of contract (count VI [relating to the January-July 2016 Consent Agreement] and count VII [relating to the November 2014 Agreement]).[4]

On July 21, 2016, OHHA filed a combined application for temporary restraining order and motion for preliminary injunction, seeking injunctive relief in connection with counts II and IV, both of which were claims of retaliation. OHHA's motion characterized

---

[3] Neither the complaint nor the first amended complaint are "short and plain statements" of plaintiff's claims, *see* Fed. R. Civ. P. 8, the complaint consisting of 35 pages (not counting exhibits) and the FAC consisting of 55 pages (not counting exhibits). Therefore, the facts contained herein are not exhaustive of the facts alleged, nor are they findings by the Court. Rather they are only meant to provide limited context for this ruling.

[4] On July 21, 2016, NPA filed its answer and counterclaim. The first amended complaint was filed on March 17, 2017. (Doc. No. 69 ["FAC"].) An answer and first amended counterclaim was filed on April 6, 2017. (Doc. No. 72.) NPA has filed a motion for leave to file a second amended counterclaim (Doc. No. 196), which will be resolved separately.

NPA's intended actions as "threats of creating a death spiral that will leave both [NPA] and OHHA greatly diminished." (Doc. No. 12 at 536.) OHHA argued that its members would suffer irreparable (albeit avoidable) harm without injunctive relief, and that "the status quo should always be preserved to prevent fiduciary breaches." (*Id.*) OHHA proposed an injunctive order that would have, *inter alia*, prohibited NPA from shutting down its export simulcast wagering signal, from failing to pay into the purse account OHHA's share of the host fees for the sale of the simulcast signal, from reducing purses offered for races, and from closing down NPA's barns and barn area by converting the premises into a ship-in only facility.

On July 22, 2016, NPA filed a motion for preliminary injunction and for temporary restraining order to be issued on or before July 26, 2016. NPA also argued that it would suffer irreparable harm by being forced to shut down its operation of interstate off-track wagering due to OHHA's improper withholding of consent, which NPA characterized as a breach of both the parties' Agreement and their historic practice. NPA argued OHHA's denial of consent was aimed at forcing renegotiation of the Agreement to provide more lucrative terms for OHHA, despite the fact that the Agreement prohibits renegotiation until the final year of its term (*i.e.*, 2023). NPA also sought to "maintain[] the long-standing *status quo* that has existed between the Parties since 1996." (Doc. No. 13 at 655.)

The Court promptly conducted several telephone conferences, followed by a hearing on July 26, 2016. Ultimately, the parties advised the Court that they had reached an agreement and submitted a proposed agreed order for the Court's approval. On July 26, 2017, the Court granted in part both motions for injunctive relief, and adopted the parties' proposed agreed order. On August 8, 2016, upon the parties' joint proposal, the Court entered an

extended agreed order that modified the original agreed order only with respect to its effective dates, making it effective "from Wednesday, July 27, 2016, at 12:01 a.m. through and including a trial on the merits of this action[.]" (Doc. No. 21, Extended Agreed Order ["EAO"] at 1076.) The gravamen of the EAO is expressed in four numbered paragraphs:

1. Northfield shall continue engaging in interstate off-track wagering, including the transmission of its simulcast signal to off-track betting facilities out-of-state, in the same manner as Northfield was doing prior to July 27, 2016;

2. Northfield shall continue to make payments to the "Northfield Park Purse Account" (as that term is defined in the parties' 2014 Agreement), from host fees generated through interstate off-track wagering in the same manner as it was doing prior to July 27, 2016;

3. Northfield shall refrain from altering, relocating, or eliminating any barns, stalls, dormitory rooms, or other backstretch amenities at the racetrack in Northfield, Ohio for the duration of this Order, except that Northfield may make alterations or other necessary changes to barns, stalls, dormitory rooms, and/or backstretch amenities at the racetrack in Northfield, Ohio for normal repairs and/or emergencies; and

4. Northfield shall continue to set purses for racing at a minimum average nightly outlay of $92,000.00, averaged on a two-week basis, beginning on August 14, 2016, with purses for individual classes of overnight races no less than the Northfield condition sheet shows for each class during the week of July 17–23, 2016. Northfield shall be required to use its best efforts to meet this minimum average nightly outlay for the duration of this Order, and shall not be held in breach of this Agreed Order for failing to meet the minimum average nightly outlay due to unforeseeable circumstances, including but not limited to: (a) race cancellations; (b) inability to fill fifteen (15) races per night; (c) inadequate number of participating horsemen for races; and/or (d) any other normal fluctuation in the manner in which races are structured.

(EAO at 1077.) Under the agreed order, NPA also posted a $50,000 bond.

More than a year later,[5] on September 21, 2017, NPA filed the instant emergency motion for relief, asserting that, after it received a September 15, 2017 report of OHHA's expert, it discovered that OHHA's expert was offering opinions as to damages for periods of time *after* the date of the agreed order, *i.e.*, after July 26, 2016. NPA argues that, in proposing the agreed order jointly with OHHA, it had the good faith understanding that the agreed order would "maintain the *status quo* during the life of this litigation," (Mot. at 4113), cutting off the accumulation of any alleged damages, including any damages under the IHA. But, to the contrary, OHHA's expert's report, in Tables 12 and 13, calculates damages for NPA's simulcasting after July 26, 2016 to allegedly "unapproved" sites, even though NPA had been simulcasting to those sites "prior to July 27, 2016[.]" (EAO at 1077 ¶ 1.) According to NPA, had the agreed order not been intended to preserve the *status quo* (in effect, granting OHHA's consent to all the sites to which NPA had been simulcasting prior to the order's effective date), NPA would have ceased all interstate off-track wagering, as it had considered doing prior to this lawsuit, so as to cut off any risk of additional damages should OHHA prevail on its underlying claims.[6] Without citing any legal authority justifying its request, NPA sought amendment of the EAO to permit it to:

(1) Cease all interstate off-track wagering with all Simulcast Sites identified on Tables 12 and 13 (with associated damages) in Cummings' Expert Report No. 2;

(2) Cease making payments to the Northfield Park Purse Account from host fees generated through interstate off-track wagering for those same Simulcast Sites identified on Tables 12 and 13;

---

[5] In the meantime, the parties proceeded with discovery, but not without constant disputes that needed to be mediated by a magistrate judge (resulting in an inordinate amount of wasted judicial resources), eventually leading to a warning order by the Court. (*See* Doc. No. 136.)

[6] In fact, NPA asserted that it "frankly did not desire to simulcast given the deteriorated relationship with OHHA[,] [but] [r]ather than spend time arguing with OHHA about consent, NPA considered terminating its signal, at least for a time, and adjusting its business model accordingly." (Mot. at 4104.)

6

(3) Make reasonable operational changes, including without limitation, altering the backstretch and related amenities, to offset the seven figure loss in simulcast revenue; and

(4) Monitor the minimum average nightly outlay of $92,000 to determine whether the loss in simulcast revenue will impact this minimum outlay.

(Mot. at 4108, footnotes omitted.)

OHHA opposed the motion, also without citing any legal authority. It urged the Court to enforce "[t]he plain language of the Agreed Orders, and common sense[.]" (Opp'n at 4174.) In its reply, NPA again argued that the EAO, under a preliminary injunction analysis, should have been intended to preserve the *status quo*, which, in NPA's view, means that damages would stop accumulating. (Reply at 4290-91.)

On November 15, 2017, the Court conducted a telephone conference with counsel to discuss the emergency motion. Following that conference, in minutes of the proceedings, the Court noted: "[C]ounsel agree that defendant is entitled under the terms of their contract to three of the four forms of relief that it seeks, as listed on page 9 of the motion (Page ID# 4121). Only the third is in dispute." (Minutes, 11/15/17.)[7] Counsel was encouraged to work together in good faith to resolve that final issue, and the entire motion, without further intervention by the Court. A hearing was set for December 5, 2017, in the event the parties could not resolve their differences.

On November 30, 2017, the parties filed a joint status report indicating their inability to resolve their differences, the need to proceed with the hearing, and a request to file

---

[7] Two days after the conference, OHHA filed a notice and request for clarification (Doc. No. 201), attempting to back-pedal with respect to its previous verbal agreement during the telephone conference. The Court saw no need for any such clarification, having already memorialized the agreement in the minutes.

supplemental briefs. These supplemental briefs finally supplied some legal arguments and case law in support of the parties' respective positions. OHHA argued that the emergency motion "seeks to modify an injunction, an interlocutory order, and an agreement between the parties, and it must be evaluated under the proper legal standard." (Pl. Suppl. at 19676 (citing *M-Audits, LLC v. HealthSmart Benefit Solutions, Inc.*, No. 1:15-cv-1433, 2017 WL 1199033, at *4 (N.D. Ohio Mar. 31, 2017); *Gooch v. Life Investors Ins. Co. of Am.*, 672 F.3d 402, 414 (6th Cir. 2012); *Toledo Area AFL-CIO Council v. Pizza*, 907 F. Supp. 263, 265 (N.D. Ohio 1995)).) NPA argued that, the only reason it is before the Court on its emergency motion, is because OHHA "has deliberately chosen to use the Court's power through the [EAO] as a 'sword' (as Her Honor put it) rather than a 'cease-fire' that it was intended to achieve." (Def. Suppl. 1 at 19683.)

On December 5 and 6, 2017, the Court conducted a hearing, accepting testimony and the arguments of counsel. The Court granted the parties' joint request to file post-hearing supplemental briefs, which largely summarize all of the earlier arguments and make limited references to the hearing transcript.

## II. DISCUSSION

### A. Standard of Review

The threshold issue for the Court's consideration relates to the standard of review. Specifically, when deciding whether to modify or vacate the EAO, the Court must determine whether to examine the parties' positions under the well-known four-prong standard for preliminary injunctive relief, or whether to look at the EAO as a contract between the parties, or whether to view the EAO as an interlocutory order of this Court. In fact, the analysis requires blending of all three standards.

8

In the first place, when both sides approached this Court with cross-motions for injunctive relief, had they not ultimately proposed their own solution, the Court would have been required to balance four factors: "(1) whether the movant has shown a strong likelihood of success on the merits; (2) whether the movant will suffer irreparable harm if the injunction is not issued; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuing the injunction." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002) (citations omitted).

When the parties, and their respective experienced counsel, presented the Court with what they characterized as an "agreed" order, it was fair for the Court to take them at their word. To the extent their proposed "agreed" order could be viewed as a contract between them (presented for the Court's approval), it was fair for the Court to believe that both parties had consented to its terms and had a meeting of the minds as to the meaning of those terms.[8] *Episcopal Ret. Homes, Inc. v. Ohio Dep't of Indus. Relations*, 575 N.E.2d 134, 137 (Ohio 1991) (citations omitted) (a meeting of the minds as to the essential terms of a contract is a requirement to enforcing the contract); *Super Food Servs., Inc. v. Munafo, Inc.*, No. C-990383, 2000 WL 238027, at *3 (Ohio Ct. App. Mar. 3, 2000) ("'There is no manifestation of mutual assent to an exchange if the parties attach materially different meanings to their

---

[8] In view of the way this matter has developed, perhaps the Court was too trusting and should have detected the ambiguity in the language, especially the language of paragraph 1 of the EAO. But given that these parties had a long relationship and were represented by highly experienced counsel on both sides, coupled with the time constraints, the urgency for timely action, and the several telephone conferences conducted by the Court, there was no reason to suspect any misunderstanding. But that is water under the bridge. The Court must now consider the evidence before it suggesting that the parties were not "speaking the same language" when they memorialized their proposed "agreed" order.

manifestations and . . . neither party knows or has reason to know the meaning attached by the other[.]'") (quoting Restatement (Second) of Contracts § 17 cmt. c (1981)).

It was also fair for the Court to assume the existence of another key element of a valid contract, namely, "consideration (the bargained for legal benefit and/or detriment)[.]" *Minster Farmers Coop. Exch. Co., Inc. v. Meyer*, 884 N.E.2d 1056, 1061 (Ohio 2008) (citation omitted). "A benefit may consist of some right, interest, or profit accruing to the promisor, while a detriment may consist of some forebearance, loss, or responsibility given, suffered, or undertaken by the promisee." *Williams v. Ormsby*, 966 N.E.2d 255, 259 (Ohio 2012) (citation omitted). Although "courts may not inquire into the adequacy of consideration, . . . whether there is consideration at all is a proper question for a court." *Id*.

Finally, because the parties brought their proposed "agreed" order to the Court for its stamp of approval, once the Court entered it as an order, it became just that -- an order of the Court,[9] and in this instance, an interlocutory order. "District courts have inherent power to reconsider interlocutory orders and reopen any part of a case before entry of a final judgment." *Mallory v. Eyrich*, 922 F.2d 1273, 1282 (6th Cir. 1991) (citing *Marconi Wireless Tel. Co. v. United States*, 320 U.S. 1, 47-48, 63 S. Ct. 1393, 87 L. Ed. 1731 (1943)). "A district court may modify, or even rescind, such interlocutory orders." *Id.* "[T]he district court has authority to reexamine the [relevant] question . . . , hold whatever hearings it deems advisable, and redetermine the issue in light of its findings and conclusions." *Id.* "Traditionally, courts will find justification for reconsidering interlocutory orders when

---

[9] Seeking the Court's imprimatur by way of an agreed order is not to be taken lightly, as each party (and their respective counsel) thereby voluntarily subjects itself to the civil contempt powers of the court once the court issues the order. *See, e.g.*, *Morris v. Century II Staffing, Inc.*, 966 F.2d 1453 (Table) (6th Cir. 1992) (affirming the district court's finding that plaintiff was in civil contempt of an agreed order).

there is (1) an intervening change in controlling law; (2) new evidence available; or (3) a need to correct a clear error or prevent manifest injustice." *Rodriguez v. Tenn. Laborers Health & Welfare Fund*, 89 F. App'x 949, 959 (6th Cir. 2004) (citation omitted).

**B.     Analysis**

Starting by analyzing the EAO as an interlocutory order of the Court, having considered the parties' positions and the testimony and argument during the two-day hearing, the Court concludes that the EAO must be modified in order to prevent manifest injustice to NPA.

The EAO *ordered* NPA to take certain actions. Of initial concern here is the order to "continue engaging in interstate off-track wagering, including the transmission of its simulcast signal to off-track betting facilities out-of-state, in the same manner as [NPA] was doing prior to July 27, 2016[.]" (EAO at 1077 ¶ 1.) NPA has no duty at all to engage in this type of wagering or simulcasting, but if it desires to do so, it has a duty to obtain OHHA's prior consent. Given OHHA's allegations that, prior to July 27, 2016, NPA was simulcasting to at least some sites without OHHA's consent, it was reasonable for NPA to assume (as did the Court itself),[10] that paragraph 1 of the EAO was intended to operate as OHHA's *consent* to the continued transmission to any sites that were already being transmitted to prior to July 27, 2016, even those that were the subject of this lawsuit. It is simply unreasonable for OHHA to take the position that NPA would have *agreed* to an order directing that it continue

---

[10] In its second supplemental brief, OHHA asserts that NPA's motion "is yet another attempt to use the passage of time to instill doubt in the mind of the Court when none existed at the time the EAO was entered." (Pl. Suppl. 2 at 20075, citing TRO Hr'g Tr. , July 26, 2016 (Doc. No. 233 at 19720).) OHHA should not presume to read the mind of the Court. Although the TRO hearing transcript indeed reflects the Court's position at that time, it was very early in the proceedings and the Court would have had *no* reason to believe, as it now appears, that these parties, despite their long-standing business relationship, had very different views regarding the meaning of the language of the EAO. It appears that even the parties did not recognize that fact; therefore, the Court can hardly be faulted for taking them at their word.

to operate in a manner that OHHA believed was in violation of the law and its contractual rights, all while damages would continue to accumulate, *and* with the added requirement of paying a bond. This is true even in the face of the stipulation that the EAO was "[w]ithout prejudice to either party's arguments with respect to any positions, claims or defenses in this lawsuit[.]" (EAO at 1076.) This language merely operated to preserve the underlying claims and issues and clarified that neither party was conceding their respective position.[11]

Further, it is equally unreasonable to think that the Court would have *ordered* NPA to violate the law and/or the parties' Agreement by continuing its operations without OHHA's corresponding consent. In other words, to be clear, had the Court understood that this was OHHA's view of the agreed order, the Court would not have adopted it. (*See also*, n.10, *supra*.)

Therefore, applying the law relating to the Court's inherent powers with respect to interlocutory orders,[12] NPA is entitled to some form of relief.

To the extent the "agreed" order as presented to the Court for its approval could be viewed as a contract, it is clear to the Court that there was neither a meeting of the minds, nor mutual consideration.

---

[11] In its second supplemental brief, OHHA asserts the truism that, "[t]o the extent, as here, the legality of the behavior is in dispute, each party assumes the risk that a subsequent ruling will go against it." (Pl. Suppl. 2 at 20075.) Of course, that is the whole point of prosecuting or defending a lawsuit. OHHA further asserts that "NPA agreed to continue transmitting its signal, which OHHA claims violates the IHA with respect to specific undisclosed, unconsented-to sites. NPA gambled on a purely legal issue. . . ." (*Id.*) But, as NPA has repeatedly argued, with reason, it "would not have taken the 'risk' described by OHHA's counsel, as the statutory penalties are substantially higher than the revenue earned from simulcasting. Indeed, NPA's original plan was to shut down simultcasting altogether to avoid the very issues now before the Court." (Def. Suppl. 2 at 20084 n. 6.)

[12] The Court rejects plaintiff's assertion that this case is similar to *M-Audits*, *supra*. The order challenged there was not an interlocutory order; it was a final order that sent the case to arbitration. In any event, the facts in *M-Audits* are very different than the facts herein.

The failure of a meeting of the minds is obvious from the previous discussion regarding the parties' respective understandings regarding paragraph 1 of the EAO. This misunderstanding was underscored by the testimony at the hearing of the parties' respective representatives. Brock Milstein ("Milstein"), the chairman and CEO of NPA (Tr. 1 at 19770), testified that it was his understanding "that the parties agreed that we were given consent in order to . . . send the signal pursuant to paragraph 1." (*Id*. at 19776.) In fact, he was so sure of that fact that he used the EAO as a document evidencing consent for various sites; he also sent it to NPA's regulator. (*Id.* at 19777.) On the other hand, Renee Mancino, the executive director of OHHA (*Id*. at 19906), did not believe paragraph 1 of the EAO covered consent. (*Id*. at 19932.) Rather "[i]t put the specific directive on [NPA] to export simulcast commensurate with what they felt which was under dispute, was the last viable consent, if you will, which was the March 24[, 2016] consent." (*Id.*)[13] This testimony reflects diametrically opposing views of paragraph 1 of the EAO and is indicative of the lack of a meeting of the minds.

As to failure of consideration, if paragraph 1 of the EAO does not constitute OHHA's consent (and the corresponding cutting off of damages as to all sites operating before July 27, 2016), then OHHA provided absolutely *no* consideration for NPA's agreement to continue to operate, when NPA had indicated its desire to stop simulcasting altogether, an action it was legally and contractually (under the Agreement) permitted to take, but for the issuance of the EAO. During the hearing, when questioned by the Court on this issue of consideration, OHHA could offer nothing of substance.[14]

---

[13] A copy of the March 24, 2016 consent letter was admitted as defendant's Exhibit 3.

[14] During the hearing, OHHA's argument bordered on the ridiculous. It claimed that, in return for NPA agreeing to *give up* its various rights under their Agreement and the statutes with respect to, for example, maintaining

Applying contract law, there was no valid contract because there was neither a meeting of the minds nor consideration on OHHA's behalf, entitling NPA to some form of relief.

Finally, if the parties had not presented their proposed "agreed" order for the Court's approval, the Court would have had to determine their cross-motions for injunctive relief on the merits. Plaintiffs brought this action, at least in part, to prevent NPA from enforcing a right it possesses under the parties' Agreement. In particular, paragraph 12 of the Agreement states, in relevant part, that NPA "reserves the right to alter, relocate or eliminate any barns, stalls, dormitory rooms or other backstretch amenities at any time; provided, however, that in the event of such alteration, relocation or elimination, [NPA] shall work with the OHHA to minimize any disruption during live racing meets." OHHA claimed in its complaint that NPA's "threat" to exercise this right amounted to retaliation against OHHA for its insistence on disclosure of certain information.

Notwithstanding plaintiffs' position, it is not retaliation for a party to a contract to exercise a right that it has under the contract.[15] At the hearing, plaintiffs' counsel acknowledged that NPA had the right to shut down the backstretch altogether (provided it minimized disruption during live racing meets), but took the further position that NPA must

---

the backstretch and paying certain purse amounts, OHHA settled for a "reduced" bond, agreed to a "lower outlay[,]" agreed to "[dis]continue to fight with them over a higher purse distribution," and "agreed to drop [their] TRO." (Tr. 2 at 20037-038.) In its second supplemental brief, OHHA's argument on this matter is equally disingenous. It asserts that, if NPA wants the EAO vacated because it should not be forced to continue acting illegally, then OHHA should be entitled to a ruling that NPA is liable for damages. (Pl. Suppl. 2 at 20074 n. 2.) This misses the point, namely, that NPA wants the EAO vacated or modified because *OHHA* will not concede that paragraph 1 operates as a consent and, therefore, NPA continues to operate some sites in a manner that *OHHA* considers illegal. NPA disagrees, but does not want to risk (and would not have risked) being wrong on this point. NPA wants to exercise its rights under paragraph 12 of the parties' Agreement, which it intended to do prior to the bringing of this lawsuit.

[15] There is no argument here that the Agreement between these parties (who have equivalent business acumen) was not mutually and fairly negotiated between them, or is in any way invalid or unenforceable.

exercise that right "reasonably" in accordance with the "duty of good faith and fair dealing[.]" (Tr. 1 at 19753.) As authority for this position, plaintiffs pointed to *PHH Mortg. Corp. v. Ramsey*, 17 N.E.3d 629 (Ohio Ct. App. 2014), a case that relies upon *Ed Schory & Sons, Inc. v. Soc. Nat'l Bank*, 662 N.E.2d 1074 (Ohio 1996).

But *PHH Mortgage* offers more support for NPA than for OHHA. There, the court described "good faith" as "'a compact reference to an implied undertaking not to take opportunistic advantage in a way that could have not been contemplated at the time of drafting, and which thereafter was not resolved explicitly by the parties.'" *Id.* at 637 (quoting *Ed Schory* 662 N.E.2d at 1082 (quoting *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1357-58 (7th Cir. 1990)).[16] The court in *Ed Schory*, in fact, noted that "'[f]irms that have negotiated contracts are entitled to enforce them to the letter, even to the great discomfort of their trading partners, without being mulcted for lack of "good faith."'" *Ed Schory*, 662 N.E.2d at 1082 (quoting *Kham & Nate's Shoes*, 908 F.2d at 1357-58.) It further explained that good faith "'is not an invitation to the court to decide whether one party ought to have exercised privileges expressly reserved in the document.'" *Id.* (quoting *Kham & Nate's Shoes*).

In light of the above, independently balancing the four factors applicable to decisions regarding injunctive relief, OHHA does not show a strong likelihood of success on the merits of its underlying claims because, by its own admission, NPA has the right to shut down the backstretch so long as it "minimize[s] any disruption during live racing meets." Further, although it may cause "substantial" and/or even "irreparable" harm to both parties if NPA

---

[16] The Court concludes that plaintiffs attempted to take "opportunistic advantage" of defendant by misusing the EAO to accomplish what it could not accomplish otherwise, all while giving up nothing in return, although leading defendant to believe they had done so.

concludes, for business reasons related to inability to obtain OHHA's required consent, that it needs to make operational changes, it is contractually entitled to do so even if those changes inflict "great discomfort" on OHHA. As OHHA's counsel acknowledged during the hearing: "[T]hat is what [the Agreement] says, and that was negotiated by the two sides together with all the rest of the terms of that agreement." (Tr. 1 at 19753.)

In view of the very case law relied upon by OHHA, it is unlikely that this Court would have granted its motion for injunctive relief had the parties not independently proposed their own "agreed" order for relief.

### III. CONCLUSION

For the reasons set forth herein, the emergency motion (Doc. No. 142/143) of defendant Northfield Park Associates, LLC is granted,[17] and the Extended Agreed Order (Doc. No. 21) is modified as follows[18] to permit Northfield Park Associates, LLC to:

1. Cease all interstate off-track wagering with all Simulcast Sites identified on Tables 12 and 13 (with associated damages) in Cummings' Expert Report No. 2;

2. Cease making payments to the Northfield Park Purse Account from host fees generated through interstate off-track wagering for those same Simulcast Sites identified on Tables 12 and 13;

3. Make reasonable operational changes, including without limitation, altering the backstretch and related amenities (in the manner

---

[17] NPA sought alternative relief, requesting that, should the Court deny its emergency motion, it would order that all alleged IHA damages stopped accumulating on July 27, 2016. (Mot. at 4108.) The Court need not decide this issue. However, because it appears that plaintiffs may have attempted to improperly use this Court's power to issue orders in a manner that harmed NPA, the Court will reserve this question of accumulating damages to a later date, and will entertain a motion in limine prior to trial.

[18] In its second supplemental brief, NPA changes its request, asserting that "[o]ptimally, the Court would vacate the EOA as of September 21, 2017 (the date NPA filed its Emergency Motion), and reserve for argument at trial whether the EAO constituted 'consent' during the period the EAO was in effect." (Def. Suppl. 2 at 20085.) But the Court concludes that the *status quo* that the EAO was intended to preserve, is better accomplished by granting the relief originally sought in the emergency motion, as well as retaining for pre-trial motion purposes, the question of whether damages should be allowed to accumulate between July 27, 2016 and September 21, 2017. (*See* n. 17.)

16

permitted by the parties Agreement), to offset the loss in simulcast revenue;

4. Monitor the minimum average nightly outlay of $92,000 to determine whether the loss in simulcast revenue will impact this minimum outlay.

Further, in anticipation of NPA's possible decision to make operational changes to the backstretch, the Court advises that it will, in that event, appoint a special master to supervise the process. The parties are directed to jointly propose two names of persons who might fill such a role. The names shall be submitted by December 29, 2017.

**IT IS SO ORDERED**.

Dated: December 13, 2017

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**